**OUTTEN & GOLDEN LLP**
Ossai Miazad*
Gregory Chiarello
Christopher M. McNerney*
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: om@outtengolden.com
Email: gchiarello@outtengolden.com
Email: cmcnerney@outtengolden.com

\* Admitted *pro hac vice*
\*\* *Pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Putative Classes*

**OUTTEN & GOLDEN LLP**
Pooja Shethji*
601 Massachusetts Avenue NW, Suite 200W
Washington, DC 20001
Telephone: (212) 245-1000
Email: pshethji@outtengolden.com

**YOUTH REPRESENT**
Michael C. Pope*
Shomari Ward**
Jessica Lopez
11 Park Place, Suite 1512
New York, New York 10007
Telephone: (646) 759-8080
Email: mpope@youthrepresent.org
Email: sward@youthrepresent.org
Email: jlopez@youthrepresent.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JACQUELINE RAMOS and EDWIN JOHNSON, individually and on behalf of all others similarly situated,<br><br>                                  Plaintiffs,<br><br>        v.<br><br>WALMART INC.,<br><br>                                  Defendant. | **Case No. 2:21-cv-13827-BRM-AME**<br><br>Judge Brian R. Martinotti<br>Magistrate Judge Andre M. Espinosa<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Jacqueline Ramos and Edwin Johnson, individually and on behalf of all others similarly situated, allege upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.      Defendant Walmart Inc. ("Walmart") is the nation's largest private employer, with a ubiquitous presence throughout every corner of this nation.

2.      Each year, Walmart hires thousands of individuals across the country, but each year it also denies employment to many qualified applicants because of unrelated and/or stale criminal history, pursuant to an overbroad criminal history screen that fails to account for evidence of rehabilitation or mitigating circumstances.

3.      Walmart's criminal history policy must be understood in the context of the reality that: first, individuals who are Black or Latinx are significantly over arrested, convicted, and incarcerated in the United States; and second, denying employment to applicants with old and unrelated convictions is an unwarranted stigmatization and unreasonable restriction on the economic opportunities of vulnerable populations.

4.      As the U.S. Commission on Civil Rights has found, "[w]hen the collateral consequences [of criminal convictions] are unrelated [either to the underlying crime for which a person has been convicted or to a public safety purpose], their imposition generally negatively affects public safety and the public good."[1]  Therefore, "[e]mployers should not automatically disqualify a candidate with a criminal record, except in circumstances when the criminal record *directly* conflicts with the scope of employment."[2]

5.      Plaintiffs are exemplars of such impacted individuals.

6.      At the time she applied for employment at Walmart, Plaintiff Ramos, a Black and

---

[1]      U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 133, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.
[2]      *Id.* at 137 (emphasis added).

Latinx woman, had a prior criminal conviction that was unrelated to the employment for which she applied.

7.    Plaintiff Ramos was qualified to work for Walmart.  Despite her conviction history, she had worked hard to better her situation and seek out gainful employment, and had submitted to Walmart strong evidence of her rehabilitation and mitigating circumstances – including that she had successfully completed a six-month internship with a Walmart subsidiary doing the same entry-level work she would perform for Walmart, and her supervisor specifically recommended her for employment by Walmart.

8.    Despite submitting this information, Walmart failed to account for, or even consider, the evidence of rehabilitation and mitigating circumstances of Ms. Ramos.

9.    At the time he applied for employment at Walmart, Plaintiff Johnson, a Black man, had prior criminal convictions that were unrelated to the employment for which he applied. His most recent criminal conviction is more than 16 years old.

10.    Plaintiff Johnson was qualified to work for Walmart.  Despite his conviction history, he, like Plaintiff Ramos, had worked hard to better his situation and seek out gainful employment.  At the time he applied for a position at Walmart, he had already held positions at comparable retail and grocery stores.

11.    Like with Plaintiff Ramos, Walmart failed to account for, or even consider, the evidence of Mr. Johnson's rehabilitation and mitigating circumstances in the form of his relevant work experience and the 16 years that had passed since his most recent criminal conviction.

12.    Plaintiffs' experiences are not isolated situations, but rather part of a broader pattern where Walmart employs an overbroad criminal history screen that fails to actually assess whether an applicant's convictions are job-related or create a business necessity for denial of

3

employment – including by failing to account for evidence of rehabilitation or mitigating circumstances – resulting in (1) Walmart's disproportionate screening out of Black and Latinx applicants, and (2) Walmart's denial of employment to many qualified applicants because of their criminal records, even where the applicant's conviction has no bearing on their suitability for the job.

13.     As a result of Walmart's actions, Plaintiffs bring classwide claims alleging that Walmart's criminal history screening policy and practice perpetuates the gross racial disparities in the criminal justice system into its applicant pool, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*., the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*, and unfairly and unlawfully creates hurdles for individuals with criminal records seeking employment in Pennsylvania, in violation of Pennsylvania's Criminal History Record Information Act ("CHRIA"), 18 Pa.C.S. § 9125.

14.     Through this lawsuit, Plaintiffs will show that the conduct outlined in this Second Amended Complaint constitutes unlawful discrimination and clearly violates Title VII and the NJLAD in text and spirit, which aim to remove any unjustified, discriminatory barriers to employment like Walmart's criminal history screen.

15.     Through this lawsuit, Plaintiffs will also show that the conduct outlined in this Second Amended Complaint violates the stated public policy of the Commonwealth of Pennsylvania to remove barriers to employment for persons who have paid the penalty for any crimes they may have committed.

16.     Plaintiffs seek monetary damages, and injunctive and declaratory relief on behalf of themselves and all other Walmart applicants similarly impacted nationwide, and Plaintiff Ramos and Plaintiff Johnson also seek monetary damages, and injunctive and declaratory relief

on behalf of all other Walmart applicants similarly impacted in New Jersey and Pennsylvania, respectively, as outlined further below.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiffs' Title VII claim pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).  This Court also has jurisdiction over Plaintiff Ramos's NJLAD claim and Plaintiff Johnson's CHRIA claim pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

18.     Plaintiff Ramos's NJLAD disparate impact claim is so closely related to her Title VII disparate impact claim that they form part of the same case or controversy under Article III of the United States Constitution.  Through both claims, Plaintiff Ramos challenges the same policy and practice of Walmart's.

19.     Likewise, Plaintiff Johnson's CHRIA claim is so closely related to his Title VII disparate impact claim that they form part of the same case or controversy under Article III of the United States Constitution.  Through both claims, Plaintiff Johnson challenges the same policy and practice of Walmart's.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events and omissions giving rise to the claim alleged herein occurred in this District, and but for Walmart's actions, Plaintiff Ramos would have continued to work in this District for Walmart.

21.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

22.     Plaintiff Ramos has exhausted her administrative remedies and complied with all statutory prerequisites to her Title VII and NJLAD claims.  Plaintiff Ramos filed a timely charge

of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about September 22, 2020.  Plaintiff Ramos received her Right to Sue letter dated April 20, 2021.

23.     Plaintiff Johnson has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claim.  Plaintiff Johnson dual-filed a timely charge of Discrimination with the EEOC and Pennsylvania Human Relations Commission on or about September 22, 2020.  Plaintiff Johnson received his Right to Sue letter dated July 23, 2021.

## PARTIES

**Plaintiff Ramos**

24.     Plaintiff Ramos and the putative Class Members she seeks to represent are each "persons," "individuals," and/or "applicants for employment" within the meaning of Title VII and NJLAD.

25.     Plaintiff Ramos is a Black and Latinx woman.

26.     Plaintiff Ramos is currently a resident of Brooklyn, New York.

27.     Plaintiff Ramos had at the time of her application to Walmart for employment, and continues to have, one felony conviction.

**Plaintiff Johnson**

28.     Plaintiff Johnson and the putative Class Members he seeks to represent are each "persons," "individuals," and/or "applicants for employment" within the meaning of Title VII and CHRIA.

29.     Plaintiff Johnson is currently a resident of Morton, Pennsylvania.

30.     Plaintiff Johnson had at the time of his application to Walmart for employment, and continues to have, three felony drug convictions and one misdemeanor conviction, with the

most recent conviction having occurred 16 years prior.

**Defendant Walmart Inc. ("Walmart")**

31.     Walmart is the world's largest company by revenue, and a purveyor of all manner of goods through a robust online presence and brick and mortar locations worldwide.

32.     Walmart has approximately 10,526 locations in 24 countries, and approximately 5,342 locations in the United States.

33.     Walmart has locations in all 50 States, the District of Columbia, and Puerto Rico.

34.     Walmart has approximately 70 locations throughout New Jersey.

35.     Walmart has approximately 160 retail stores and seven distribution centers in Pennsylvania.

36.     Walmart employs approximately 2,300,000 employees worldwide and approximately 1,600,000 in the United States in a wide variety of jobs.

37.     Walmart is the largest private employer in the United States.

38.     Walmart is headquartered in Bentonville, Arkansas.

39.     At all relevant times, Walmart has been an "employer," "person" and/or an "organization" as defined by Title VII, the NJLAD, and CHRIA

40.     At all relevant times, Walmart has been aware of the requirements of CHRIA and yet has disregarded those requirements.

## STATEMENT OF FACTS

**Plaintiff Jacqueline Ramos**

41.     On or around August 2019, Ms. Ramos began a full-time six-month internship at a Walmart subsidiary, Jet.com, in Hoboken, New Jersey.  It was an entry-level job that did not require any prior technical training, qualifications, or certifications.  This job also did not require

any higher education.

42.     The principal goal of the internship, as Ms. Ramos understood it, was to demonstrate that Ms. Ramos would be a suitable employee for Walmart.

43.     In her internship, Ms. Ramos performed entry-level IT support.

44.     Ms. Ramos's job duties included providing basic desktop computer support for Walmart employees, answering Walmart employee's computer questions that were submitted to the team through an online ticketing system, and supporting newly hired employees with setting up their new accounts and computers.

45.     Towards the end of her internship, Ms. Ramos's supervisor, Michael Jones, encouraged her to apply to work directly for Walmart for an entry-level IT support position that would involve performing substantially the same work that she had established she could perform through her internship.

46.     Like with her internship, the entry-level position did not require Ms. Ramos to have a college degree or submit any evidence of technical training, qualifications, or certifications to apply.

47.     Following Mr. Jones's advice, on or around January 2020, Ms. Ramos applied to work for Walmart.

48.     Soon thereafter, Ms. Ramos successfully interviewed with two Walmart supervisors.

49.     As a result of that successful interview, on or about January 28, 2020, Ms. Ramos was sent an email by Walmart's third-party criminal history screening company, First Advantage, explaining that she would have to authorize a background check as part of her application process.

50.     That same day, Ms. Ramos completed the forms necessary to authorize First Advantage to perform a criminal background check and, as requested, disclosed her sole felony conviction, that occurred in 2017.

51.     On or about January 31, 2020, Ms. Ramos received an offer letter from the Walmart Hiring team formally offering her employment.

52.     On or about February 3, 2020, Ms. Ramos received another email from First Advantage, with the subject line: "URGENT Request for Information – Your WALMART INC Background Screening."  The email instructed Ms. Ramos to provide specific details about her conviction.

53.     Later that day, Ms. Ramos logged into First Advantage's online portal, and explained the circumstances of her conviction and provided information contextualizing her conviction and providing subsequent evidence of rehabilitation.

54.     Of note, Ms. Ramos explained that she was with friends who committed the crime in question, and that she took a plea deal for fear of receiving a lengthy prison sentence.  She also explained that since her conviction, she had focused on securing employment and enrolled in a workforce development program that led to her internship with Jet.com.  She further noted her plan to enroll in a program to obtain a bachelor's degree in computer science.

55.     On or about the very next day, February 4, 2020, Ms. Ramos received an email from First Advantage that informed her that First Advantage conducted a background check and Walmart was considering revoking her job offer based on the results of the report.

56.     Shortly thereafter, Ms. Ramos contacted her former supervisor, Mr. Jones, and the Walmart recruiter who had been her point of contact through the application process, Sara

Schultz.  Ms. Ramos wanted to know if there was any additional information she could provide to assist in Walmart's assessment of her employment.

57.     Over the course of approximately the next week, both Mr. Jones and Ms. Schultz informed Ms. Ramos that the decision was out of their hands, and there was nothing they could do.  Ms. Ramos understood this to mean that the decision was to be made at the corporate level.

58.     On or about February 12, 2020, Ms. Ramos received another email from First Advantage.  This email stated that her job offer was being rescinded by Walmart because of her criminal history.

59.     Shortly thereafter, Ms. Ramos again contacted Ms. Shultz via text to ask, again, if there was anything she could do to have her offer reinstated.  On or around February 19, 2020, Ms. Shultz emailed Ms. Ramos stating that her job offer was officially rescinded.

60.     Ms. Ramos continued to try to convince Walmart to reinstate her position, this time through counsel, explaining that her conviction, especially in light of her evidence of rehabilitation and mitigation, was not job-related and should not disqualify her from employment with Walmart.

61.     On or about June 26, 2020, Walmart responded that, despite the information she had provided, it viewed Ms. Ramos as having "provided no evidence of rehabilitation efforts or mitigating circumstances" and that it would not revisit its denial of employment.

**Plaintiff Edwin Johnson**

62.     On or about March 21, 2020, Mr. Johnson applied online to work for Walmart in an entry-level stocking position that did not require any prior technical training, qualifications, or certifications.  The job also did not require any higher education.

63.     Roughly one month later, on April 29, 2020, Mr. Johnson successfully

interviewed at a Walmart store located in Eddystone, Pennsylvania. Walmart provided Mr. Johnson with an offer of employment on the spot, which he accepted.

64. After Mr. Johnson accepted the offer of employment, he was required to consent to a background check that would be performed by First Advantage, and completed the forms necessary to do so.

65. On or about April 30, 2020, Mr. Johnson received an email from First Advantage, on behalf of Walmart, with the subject line "URGENT Request for Information – Your WALMART INC Background Screening."

66. Later that day, Mr. Johnson responded by submitting the required information to First Advantage through the provided website link.

67. Mr. Johnson was scheduled for and attended a Walmart orientation on May 7, 2020. At that orientation, he was informed that his background check had cleared and he could start working for Walmart that day. In reliance on this assurance, Mr. Johnson gave two weeks' notice to his then-employer.

68. On or about May 12, 2020, Mr. Johnson received a phone call from a female Walmart Human Resources employee, who told Mr. Johnson that he was ineligible to be hired because of his criminal history. Though Mr. Johnson asked the Walmart employee why specifically he was being denied employment, she responded that she could not tell him the details other than that "something came back" as to his criminal history (or words to that effect). The Walmart Human Resources employee provided a phone number for First Advantage, which also just told Mr. Johnson that "something" was on his background check without any additional information.

69. Despite being denied employment on or about May 12, 2020, Mr. Johnson did not

receive a copy of the information that Walmart used to deny him employment until August 12, 2020, after he had requested a copy of his background check report from First Advantage.  The letter attached to the report was dated May 4, 2020, which is the same date that appeared on his background check report.

70.     Walmart denied Mr. Johnson employment despite the time that had passed since his most recent conviction and strong evidence of subsequent rehabilitation in the form of relevant job experience.  For example, Mr. Johnson had previously worked at a wholesale supermarket from approximately August 2007 to May 2016, an arts and crafts store from approximately August 2016 to January 2020, and was working at a chain grocery store from June 2019 until he gave his notice as a result of the Walmart offer of employment.

71.     Mr. Johnson's criminal history was not relevant to the entry-level stocking position for which he applied for reasons including the nature of the convictions, the age of the convictions, his employment history, and the years Mr. Johnson has spent contributing positively to the community without any further convictions.

**Factual Allegations Common to Plaintiff and All Putative Class Members**

***Walmart Uses a Uniform and Centrally Administered Criminal History Screening Policy That Is Devoid of Individualized Analysis, Fails to Account for Evidence of Rehabilitation or Mitigating Circumstances, and Has Other Serious Flaws.***

72.     Walmart employs an overbroad criminal history screening policy that is devoid of individualized analysis.

73.     Pursuant to Walmart's policy, a select, limited group of Walmart employees located at its corporate headquarters evaluate applicant criminal history, employing a uniform and centrally administered process.

74.     An applicant's potential supervisors, and the individuals who interview an applicant, have no input whatsoever as to whether Walmart will disqualify an applicant because of their criminal history.

75.     In fact, pursuant to policy, Walmart will discipline or even terminate an employee for discussing an applicant's criminal history.

76.     While Walmart purports to solicit evidence of rehabilitation or mitigating circumstances to consider as part of its criminal history review, the company lacks sufficient processes to meaningfully account for this information.

77.     To the contrary, upon information and belief, Walmart's standard operating procedure is that it typically will not alter a determination that criminal history is disqualifying because of evidence of rehabilitation or mitigating circumstances.

78.     For example, in the case of Plaintiff Ramos, Walmart not only failed to properly consider the evidence of rehabilitation and mitigating circumstances that she submitted, it refused to even acknowledge she had submitted such evidence.

79.     Similarly, Walmart failed to properly consider the evidence of rehabilitation provided by Mr. Johnson, including his more than 13 years as a productive member of society without a conviction.

80.     Walmart's criminal background check policy also renders ineligible for hire applicants who purportedly fail to provide a precise rendition of their criminal history on their job application, pursuant to Walmart's uniform policy which states that individuals who "intentionally provide false information during the background check process will not be eligible for hire."

81.     As a result of its overbroad policy, Walmart denied employment to Plaintiffs and disproportionately denies employment to countless other Black and Latinx applicants.

***Walmart's Criminal History Policy Has a Disparate Impact on Black and Latinx Applicants.***

82.     Title VII and the NJLAD prohibit employment policies and practices that have a disparate impact on protected groups.  *See* 42 U.S.C. §§ 2000e *et seq*.; N.J.S.A. § 10:5-1 *et seq.*

83.     As the U.S. Commission on Civil Rights reported, "when employers use criminal background checks to indiscriminately disqualify all applicants with criminal records, these employers severely curtail employment opportunities for formerly incarcerated people"[3] and "[B]lack and Latino individuals are likelier to have criminal records than white and Asian people[.]."[4]

84.     The U.S. Census Bureau reports that although Black and Latinx individuals comprise only 29% of the U.S. population, they make up 57% of the U.S. prison population.[5] This results in imprisonment rates for Black and Latinx individuals that are 5.9 and 3.1 times the rate for white adults, respectively.[6]  And, "these disparities exist for both the least and most serious offenses."[7]

85.     According to a report to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance, "[i]n 2010, 8% of all adults in the United States had a felony conviction on their record" but "[a]mong African-

---

[3]     *See supra* note 1, at 42.
[4]     *Id.*
[5]     Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing Project (2018) at 9, https://www.sentencingproject.org/wp-content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf.
[6]     *See id.* at 6-7.
[7]     *Id.* at 7.

American men, the rate was one in three."[8]  Additionally, in 2016, of the 277,000 people

imprisoned for a drug offense, over 56% were Black or Latinx individuals.[9]

86.     Like with the United States, Black and Latinx individuals also are

overincarcerated in New Jersey, when compared with whites.[10]

87.     It is undisputed among social science researchers that Black individuals interact

with the criminal justice system at rates that vastly outnumber the rates of incarceration for

whites.  As a result, the impact of a criminal record is much more severe on Black job applicants

than it is on white applicants.[11]

88.     Audit studies conducted by researchers at Harvard and Princeton Universities also

have found that even among people with criminal records, Black applicants are particularly

disadvantaged in the job market compared to white people with criminal records.[12]

89.     Given these statistics, and Walmart's ubiquitous presence throughout ever corner

of the nation, it is more than plausible that by screening for criminal history, Walmart's hiring

---

[8]     *See* supra note 5, p. 7; *see also id.* at 1 (explaining that racial and ethnic disparities among women are also prevalent).

[9]     *See* U.S. Department of Justice, Bureau of Justices Statistics Special Report, *Prevalence of Imprisonment in the U.S. Prison Population, 1974-2001*, 5 (2003); *See generally* Nazgol Ghandnoosh, Ph.D., Race and Punishment: Racial Perceptions of Crime and Support for Punitive Polices (September 2014).

[10]     *See, e.g.*, Prison Policy Initiative, *New Jersey profile*, https://www.prisonpolicy.org/profiles/NJ.html; *see also* Prison Policy Initiative, *Blacks Are Overrepresented in New Jersey Prisons and Jails*, https://www.prisonpolicy.org/graphs/2010percent/NJ_Blacks_2010.html (graph reflecting overincarceration of Black individuals); Prison Policy Initiative, *Hispanics Are Overrepresented in New Jersey Prisons and Jails*, https://www.prisonpolicy.org/graphs/2010percent/NJ_Hispanics_2010.html (graph reflecting overincarceration of Latinx individuals).

[11]     *See generally* Devah Pager, *Marked: Race, Crime, and Finding Work in an Era of Mass Incarceration*, Chicago, IL: University Of Chicago Press (2007).

[12]     Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad.

practices import the nation's severe racial disparities in conviction rates, resulting in a policy and practice that disproportionately screens out Black and Latinx applicants, when compared with white applicants.

***Walmart's Criminal History Screening Policy Is Not Job-Related or Consistent with Business Necessity.***

90.     Walmart's policy and practice of denying employment to individuals with criminal convictions, including individuals who Walmart deems to have failed to fully or precisely self-disclose their criminal history, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.  Rather, it renders persons ineligible for employment for convictions that do not relate to suitability for employment.

91.     Having a conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job.  Upon information and belief, no reliable studies or empirical data suggest that applicants with criminal records are more likely to engage in terminable offenses.[13]

92.     Walmart has not put into place valid systems to accurately assess evidence of rehabilitation and mitigation, especially as to work history and time since last convictions, which social science establishes are some of the best markers of rehabilitation.

93.     Highlighting that Walmart's criminal history screening policy does not accurately account for its business necessity and/or evaluate the job-relatedness of an applicant's criminal history, Walmart does not consider input from relevant supervisors as part of its analysis of

Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937, 955-61 (2003).

[13]     *See, e.g.*, Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

whether a conviction is job-related, or actually assess an applicant's evidence of mitigation or rehabilitation.

94.     Walmart also routinely hires individuals, and allows them to start working, before completing a full criminal history background check, illustrating that Walmart itself does not view its criminal history screening process as necessary to protect the safety of its workforce or customers.

95.     Moreover, Walmart's requirement that applicants precisely self-disclose their criminal history is not an accurate proxy for determining an applicant's criminal history, honesty, or trustworthiness, and is not otherwise job-related or consistent with business necessity.

96.     For example, the criminal justice system is a complex maze of technical and varied terminology, which leads many persons with criminal records not to realize the full extent or exact phrasing of their criminal history on job applications.  And, an applicant may be unaware of the full extent of their criminal history for many reasons, including because they: (i) pled to a charge that is different from the one of which they were initially accused; (ii) misremembered older convictions; (iii) were provided inaccurate or incomplete information from their criminal defense attorney, (iv) failed to understand how nuanced local legal disclosure laws differ their reporting obligations between states or cities, (v) misunderstood the distinction in legal terminology on the application question (for example, the difference between "accusation," "plea," "arrest," "conviction," or "adjudication") or (iv) did not realize their single plea included multiple separate offenses.

97.     Using self-disclosure of criminal history – including as a memory or integrity test – is therefore not job-related or consistent with business necessity.

98.     Upon information and belief, Walmart has not validated its criminal history policies and practices consistent with the Uniform Guidelines on Employee Selection Procedures.

99.     There also are less discriminatory alternatives that would have better achieved any legitimate business purpose of Walmart.

100.    Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; (2) instituting a meaningful process for Walmart to account for supervisors' input, and an applicant's evidence of mitigation and/or rehabilitation; (3) limiting the extent of inquiry to recent and serious convictions only, and/or (4) ceasing entirely the practice of running background checks, as lacking an actual demonstrative link to an individual's ability to perform the job in question or risk profile.

101.    Walmart knew or should have known its obligations under CHRIA, namely to limit use of criminal records only to those situations where criminal conviction histories in fact established non-suitability for a particular position.  These obligations are well-established by the plain language of CHRIA and in longstanding case law.

102.    Walmart showed reckless disregard or indifference to its obligations under the law.

103.    Through its actions, Walmart has acted willfully in violating the requirements of CHRIA.

## **CLASS ACTION ALLEGATIONS**

104.    Plaintiffs bring this case as a proposed class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and others similarly situated.

105.     Plaintiffs bring this class action pursuant to Rule 23(a), (b)(2), and/or (c)(4)

seeking injunctive and declaratory relief.

106.     Plaintiffs also bring this class action pursuant to Rule 23(a), (b)(3) and/or (c)(4)

seeking backpay, monetary damages, and other make-whole relief.

107.     Plaintiffs assert their First Cause of Action against Walmart on behalf of the

"Nationwide Class" defined as follows:

> All Black and Latinx individuals nationwide who, during the relevant statute of
> limitations period, were denied employment at Walmart based in whole or in part
> on their criminal history. [14]

108.     Plaintiff Ramos asserts her Second Cause of Action against Walmart on behalf of

the "New Jersey Class" defined as follows:

> All Black and Latinx individuals in New Jersey who, during the relevant statute of
> limitations period, were denied employment at Walmart based in whole or in part
> on their criminal history. [15]

109.     Plaintiff Johnson asserts his Third Cause of Action against Walmart on behalf of

the "Pennsylvania Class" defined as follows:

> All individuals in Pennsylvania who, during the relevant statute of limitations
> period, were denied employment at Walmart based in whole or in part on their
> criminal history. [16]

110.     Together, the Nationwide Class, New Jersey Class, and Pennsylvania are the

"Classes."

111.     The members of the Classes are collectively referred to as "Class Members."

---

[14]     For the avoidance of doubt, this definition includes individuals Walmart denied for
purportedly failing to fully or precisely self-disclose their criminal history.
[15]     For the avoidance of doubt, this definition also includes individuals Walmart denied for
purportedly failing to fully or precisely self-disclose their criminal history.
[16]     For the avoidance of doubt, this definition also includes individuals Walmart denied for
purportedly failing to fully or precisely self-disclose their criminal history.

112.    Plaintiffs reserve the right to amend the definition of above-defined Classes based on discovery or legal developments.

113.    The Class Members identified herein are so numerous that joinder of all members is impracticable.  Walmart is a largest employer in the United States.  The number of applicants harmed by Walmart's violations of the law is far greater than feasibly could be addressed through joinder.  The precise number is uniquely within Walmart's possession, and Class Members may be notified of the pendency of this action by published, mailed and/or e-mailed notice.

114.    There are questions of law and fact common to Class Members, and these questions predominate over any questions affecting only individual members.  Common legal and factual questions include, among others:

  a.    Whether Walmart's policy and practice to exclude job applicants based on their criminal history has a discriminatory disparate impact on Black and and/or Latinx individuals;

  b.    Whether Walmart's policy and practice to exclude job applicants based on their criminal history is job-related and/or consistent with business necessity;

  c.    Whether Walmart systemically assesses applicants' evidence of rehabilitation or mitigating circumstances when assessing criminal history;

  d.    Whether there was a less discriminatory policy and practice that would have met Walmart's legitimate needs;

  e.    Whether Walmart violated CHRIA by denying employment to Plaintiff Johnson and the Pennsylvania Class based on their criminal convictions;

  f.    Whether Walmart was willful in its noncompliance with the requirements of CHRIA;

  g.    Whether Class Members are entitlement to damages; and

  h.    Whether a declaratory judgment and/or injunctive or other equitable relief is warranted regarding Walmart's policies and practices.

115.     Plaintiffs are members of the Nationwide Class they seek to represent, Plaintiff

Ramos is a member of the New Jersey Class she seeks to represent, and Plaintiff Johnson is a

member of the Pennsylvania Class he seeks to represent.  Walmart took discriminatory adverse

action against Plaintiffs based on their criminal history.   Walmart also denied employment to

Plaintiff Johnson based on his criminal history without those criminal convictions being related

to Plaintiff Johnson's suitability for employment in the position for which he applied.

116.     Plaintiffs' claims are typical of the claim of the Classes they seek to represent,

because Plaintiffs: (1) applied for a job with Walmart within the relevant time period; (2) were

subjected to the challenged criminal history screening process for applicants; and (3) were

denied a position with Walmart because of their criminal history.  This claim is shared by each

and every Class Member.  Upon information and belief, it is Walmart's standard practice is to

take adverse actions against applicants based on criminal history in a manner that is

discriminatory, not job related, inconsistent with business necessity, and otherwise not related to

an applicant's suitability for employment.

117.     Plaintiffs will fairly and adequately represent and protect the interests of Class

Members because their interests coincide with, and are not antagonistic to, the interests of the

Class Members they seek to represent.  Plaintiffs have retained counsel who are competent and

experienced in complex class actions, including litigation pertaining to Title VII, criminal

background checks, disparate impact litigation, other employment litigation, and the intersection

thereof.  There is no conflict between Plaintiffs and the Class Members.

118.     A class action is superior to other available methods for the fair and efficient

adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as

a result of Walmart's uniform policies and practices.  Walmart has acted and/or refused to act on

grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class Members as a whole.  Because Walmart has maintained a common policy of denying employment to individuals with criminal histories but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated.  Judicial economy will be served by the maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would otherwise be placed on the judicial system by the filing of many similar suits by individually harmed persons.  There are no obstacles to the effective and efficient management of this lawsuit as a class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq*.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

119.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

120.    Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class.

121.    Plaintiffs timely filed a charge with the EEOC, with class-wide allegations, and received Right to Sue letters, thereby exhausting their administrative remedies.  Furthermore, Plaintiff Johnson is entitled to "piggyback" off the EEOC charge of Plaintiff Ramos.

122.    Walmart's criminal history screening policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail to fully or precisely self-disclose their criminal history) has harmed, and continues to harm, Plaintiffs, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of 42 U.S.C. §§ 2000e *et seq.*

123.     Walmart's policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail to fully or precisely self-disclose their criminal history) had and continues to have a disparate impact on Black and Latinx individuals and is neither job related nor consistent with business necessity. Even if Walmart's policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail to fully or precisely self-disclose their criminal history) could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

124.     Walmart's conduct has caused, and continues to cause, Plaintiffs and the members of the Nationwide Class losses in earnings and other employment benefits.

125.     Plaintiffs and the Nationwide Class also seek injunctive and declaratory relief to correct Walmart's discriminatory policies and practices.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq*.**
**(On Behalf of Plaintiff Ramos and the New Jersey Class)**

</div>

126.     Plaintiff Ramos incorporates by reference the allegations in all preceding paragraphs.

127.     Plaintiff Ramos brings this claim on her own behalf and on behalf of the New Jersey Class.

128.     Plaintiff Ramos timely dual-filed her EEOC charge with the New Jersey State Division on Human Rights, with class-wide allegations, received a Right to Sue letter, and has thus exhausted her administrative remedies.

129.     Walmart's criminal history screening policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail

to fully or precisely self-disclose their criminal history) has harmed, and continues to harm, Plaintiff Ramos, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of N.J.S.A. § 10:5-1 *et seq.*

130.   Walmart's policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail to fully or precisely self-disclose their criminal history) had and continues to have a disparate impact on Black and Latinx individuals and is neither job related nor consistent with business necessity. Even if Walmart's policy and practice of denying employment opportunities to individuals with criminal convictions (including individuals who purportedly fail to fully or precisely self-disclose their criminal history) could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

131.   Walmart's conduct has caused, and continues to cause, Plaintiff Ramos and the members of the New Jersey Class losses in earnings and other employment benefits.

132.   Plaintiff Ramos and the New Jersey Class also seek injunctive and declaratory relief to correct Walmart's discriminatory policies and practices.

### THIRD CLAIM FOR RELIEF
**Violation of CHRIA's Use of Information Provision**
**Criminal History Record Information Act, 18 Pa. Cons. Stat. Ann. § 9125**
**(On Behalf of Plaintiff Johnson and the Pennsylvania Class)**

133.   Plaintiff Johnson incorporates by reference the allegations in all preceding paragraphs.

134.   Plaintiff Johnson brings this claim on his own behalf and on behalf of the Pennsylvania Class.

135.   CHRIA provides that, "[f]elony and misdemeanor convictions may be considered by the employer ***only*** to the extent to which they relate to the applicant's suitability for

employment in the position for which he has applied."  18 Pa.C.S. § 9125(b) (emphasis

supplied).

136.    Plaintiff Johnson and the members of the Pennsylvania Class have convictions

that Walmart considered when deciding not to offer them employment.

137.    Plaintiff Johnson's convictions and the convictions of members of the

Pennsylvania Class are not related to their suitability for employment.

138.    Plaintiff Johnson and the members of the Pennsylvania Class have been aggrieved

by Walmart's denials of employment.

139.    Rather than making assessments of what crimes related to the suitability of

applicants for particular jobs, Walmart applies an overbroad criminal history screen that fails to

actually assess whether an applicant's convictions are job-related – including by failing to

account for evidence of rehabilitation or mitigating circumstances.

140.    As a result of the denials of employment, and the manner in which those denials

occur, Plaintiff Johnson alleges that Walmart rejects applicants with criminal records, whether or

not they were job related or stale, denying job opportunities to those with criminal records to the

detriment of Plaintiff Johnson and the Pennsylvania Class.

141.    Walmart's actions in denying employment to Plaintiff Johnson and the members

of the Pennsylvania Class showed reckless disregard or indifference to its obligations under the

law.

142.    As a result of its actions, Walmart is liable to Plaintiff Johnson and the members

of the Pennsylvania Class for injunctive relief, damages and reasonable costs of litigation, and

attorneys' fees, pursuant to 18 Pa.C.S. § 9183(a)-(b).

143.    Walmart's conduct has been willful, rendering it liable for exemplary and punitive damages, pursuant to 18 Pa.C.S.§ 9183(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

a.      A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, the NJLAD, and CHRIA, and that Walmart acted willfully under CHRIA;

b.      A preliminary and permanent injunction against Walmart and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

c.      An order that Walmart institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of Title VII and the NJLAD and that Walmart eradicate the effects of past and present unlawful employment practices;

d.      Certification of the case as a class action on behalf of the proposed Classes;

e.      Designation of Plaintiffs as representatives of the members of the Nationwide Class;

f.      Designation of Plaintiff Ramos as a representative of the members of the New Jersey Class;

g.      Designation of Plaintiff Johnson as a representative of the members of the Pennsylvania Class;

h.      Designation of Plaintiffs' counsel of record as Class Counsel;

i.      Restoring of Plaintiffs and Class Members to their rightful positions at Walmart or those positions equivalent at Walmart (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

j.      An award of backpay;

k.      An award of nominal and/or exemplary damages;

l.      Punitive and/or liquidated damages under the NJLAD to the extent allowable by law;

m.     An award of all statutory damages provided by CHRIA, including actual and real damages for each violation, and exemplary and punitive damages for each violation found to be willful;

n.     An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

o.     Such other injunctive and/or declaratory or other equitable relief that is necessary to correct Walmart's discriminatory policies and practices;

p.     Pre-judgment and post-judgment interest, as provided by law;

q.     Payment of a reasonable service award to Plaintiffs, in recognition of the services she rendered and will continue to render to Class Members, and the risks they have taken and will take; and

r.     Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  December 21, 2021          Respectfully submitted,

By:  */s/ Gregory Chiarello*
**OUTTEN & GOLDEN LLP**
Ossai Miazad*
Gregory Chiarello
Christopher M. McNerney*
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: om@outtengolden.com
Email: gchiarello@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji*
601 Massachusetts Avenue NW, Suite 200W
Washington, DC 20001
Telephone: (212) 245-1000
Email: pshethji@outtengolden.com

**YOUTH REPRESENT**
Michael C. Pope*
Shomari Ward**
Jessica Lopez
11 Park Place, Suite 1512
New York, New York 10007
Telephone: (646) 759-8080
Email: mpope@youthrepresent.org
Email: sward@youthrepresent.org
Email: jlopez@youthrepresent.org

\* Admitted *pro hac vice*
\*\* *Pro hac vice* application forthcoming

*Attorneys for Plaintiffs and the Putative
Classes*

**CERTIFICATE OF SERVICE**

I, Gregory Chiarello, an attorney, hereby certify that on December 21, 2021, I caused to be served a copy of the foregoing **Second Amended Class Action Complaint** in the above entitled action using the CM/ECF system, which sent notification of this filing to all counsel of record.

<div align="center" style="margin-left:50%">

/s/ *Gregory Chiarello*
Gregory Chiarello

</div>