## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| JACQUELINE RAMOS and EDWIN JOHNSON, individually and on behalf of all others similarly situated, | : : : | **Civil Action No. 21-13827-BRM-AME** |
| | : | **OPINION and ORDER** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WALMART, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**ESPINOSA**, Magistrate Judge

This matter comes before the Court on a discovery dispute arising out of document requests and interrogatories, served by plaintiffs on defendant Walmart, Inc. ("Walmart"), pertaining to the creation, implementation, and revision of Walmart's criminal background check policies and procedures ("CBCP"). The dispute concerns the inter-related issues of the scope of CBCP information to which the plaintiffs are entitled and the time period applicable to such discovery. It was raised initially by joint letter of April 26, 2022 [ECF 51], consistent with the Court's standing Civil Case Management Order ("CMO"), and sharpened and updated by letters of August 5, 2022 [ECF 78] and October 24, 2022.[1] The Court has reviewed those letters and heard argument, on the record.[2] For the following reasons, the plaintiffs' request for CBCP discovery is granted in part and denied in part, and Walmart shall provide discovery responses and produce documents in accordance with the findings set forth in this Opinion.

---

[1] The October 24, 2022 letter was submitted by email, pursuant to the CMO, due to its reliance on confidential information produced by Walmart in discovery.
[2] The Court heard argument on July 20, 2022, and October 24, 2022.

I.      BACKGROUND

This is a disparate impact case arising under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e *et seq.*, as amended ("Title VII"). The claim concerns the criminal background

check policy used by Walmart to screen applicants as part of its hiring process. According to the

operative Second Amended Class Action Complaint ("Complaint"), Walmart's policy

disproportionately and unlawfully affects Black and Latino individuals who apply for jobs but

are disqualified due to their criminal history, even where the prior conviction has no bearing on

the applicant's suitability for the job. (Compl. ¶¶ 2-3, 12-13.) The Complaint alleges plaintiffs

Jacqueline Ramos and Edwin Johnson ("Plaintiffs") were each offered employment at Walmart

stores, in New Jersey and Pennsylvania respectively, but were later informed they were ineligible

for hire due to the results of the criminal background check performed by Walmart, through a

third-party company, First Advantage. (*Id.* ¶¶ 51, 58, 63, 68.) Plaintiffs bring a Title VII

disparate impact claim against Walmart on behalf of a class defined as: "[a]ll Black and Latinx

individuals nationwide who, during the relevant statute of limitations period, were denied

employment at Walmart based in whole or in part on their criminal history." (*Id.* ¶ 107.) The

parties agree that the Class Period for the Title VII claim begins on January 1, 2019.[3]

II.     THE DISCOVERY DISPUTE

Plaintiffs seek discovery on the process underlying the creation and modification of the

CBCP, between its inception and the Class Period. They argue that the considerations leading to

Walmart's formulation of the CBCP, the source information on which the initial CBCP was

based, subsequent reviews and/or studies of the CBCP, and any similar information concerning

---

[3] The Complaint also asserts a claim under the New Jersey Law Against Discrimination, brought by Ramos on behalf of herself and a New Jersey subclass, and a claim under the Pennsylvania Criminal History Record Information Act ("CHRIA"), brought by Johnson on behalf of himself and a Pennsylvania subclass.

revisions to the CBCP will shed light on why the criminal background checks were instituted and how the policy was tailored, if at all, to the jobs for which applicants were screened. For this reason, they maintain the CBCP discovery at issue in this dispute is relevant to critical elements of their Title VII claim, specifically, rebutting any demonstration by Walmart that the CBCP served a business necessity and establishing that there were less discriminatory alternatives available to Walmart.

Walmart objects to the CBCP discovery on the basis that it is irrelevant and burdensome. Initially, in the April 26 joint dispute letter, Walmart took the position that, because Plaintiffs' discrimination claim pertains to the *impact* of the CBCP, as distinguished from any disparate *treatment* of job applicants, any discovery regarding Walmart's motivations for adopting and/or revising the CBCP is irrelevant. In other words, Walmart maintained that any pre-Class Period iteration of the CBCP does not relate to the effect of the CBCP on Plaintiffs and thus is not discoverable. Later, as set forth in the August 5 joint dispute letter, Walmart expanded its view of discoverable information, following guidance provided by the Court during a conference, conducted on the record, on July 20, 2022. At the conference, the Court directed the parties to continue to meet and confer and suggested they craft a resolution consistent with the persuasive decision issued by the Northern District of California in *Lee v. Hertz Corp.*, 2019 WL 6219742 (N.D. Cal. Nov. 19, 2019).

Thereafter, Walmart proposed the following production:

> non-privileged information comprising each version of Walmart's criminal background check policy, practices, and procedures as they apply to the Base background check (the at-issue background check), and drafts of and revisions to same, as well as manuals, handbooks, and other written instructions and formal guidance concerning the application of those CBC policies and practices, and all draft of and revisions to same.

(Aug. 5 ltr. at 1.) Without conceding that pre-Class Period discovery is relevant or proportional to the needs of this case, Walmart offered to search for these documents and things during two time periods: the one year preceding the CBCP rollout, which it represents occurred in August 2004, and during the Class Period applicable to the disparate impact claim. (*Id.* at 5.) Walmart refers to this offer as its "Proposed Production."[4]

Nevertheless, the parties' efforts to bridge the gap between Plaintiffs' requests and Walmart's production offer have not been fruitful. They continue to disagree about the scope of CBCP discovery in two main respects. First, Plaintiffs argue that, in light of the elements of their Title VII disparate impact claim, they are entitled not only to the drafts and versions of the CBCP itself but, in order to evaluate business necessity and less discriminatory alternatives, are also entitled to obtain the following categories of discovery: documents consulted, relied upon, and otherwise used by Walmart in creating and/or revising the CBCP; documents discussing creation/modification to the CBCP; and "audits, investigations, and related documents that touch on the CBCP." (Aug. 5 ltr. at 1.) Second, Plaintiffs argue that the discrete time periods for which Walmart offers to search for its Proposed Production are too limited, in that Walmart truncates the creation period, which Plaintiffs maintain extends as far back as fiscal year 2003, and completely eliminates the interim period between CBCP implementation in 2004 and the start of the Class Period, thus omitting any potential discovery related to the study or modification of the CBCP. The latter, Plaintiffs argue, is necessary for a complete analysis of their disparate impact claim because any "revisions to the CBCP to make it more or less restrictive . . . are relevant to showing whether a less discriminatory alternative is feasible and whether Walmart considered

---

[4] Later, in the October 24 letter, Walmart noted that, for the period between CBCP rollout and the Class Period, it was willing to produce all final versions of the CBCP and the base adjudication criteria guidelines for the entire interim period, in spite of its view that such material was irrelevant.

job-relatedness and business necessity in arriving at the current CBCP." (Aug. 5 ltr. at 3.) Walmart, in response, maintains that its Proposed Production captures the spirit of the *Lee* decision and further argues that Plaintiffs' discovery requests, particularly for information concerning the fifteen-year interim period, are overbroad and irrelevant. It contends that "information generated in the interim neither constitutes contemporaneous documentation of Walmart's justification for enacting the policy originally, nor shows the application of the policy applicable to Plaintiffs or the putative class." (Aug. 5 ltr. at 6.)

This dispute implicates Plaintiffs' Interrogatories 4-7 and Requests for Production 3-7 and 28,[5] in which Plaintiffs seek: identification of each version of the CBCP (Rog 4); each person involved in its creation or modification (Rog 5); every document relied on in creating or modifying the CBCP (Rog 6); and each person involved in the implementation of the CBCP (Rog 7). As to documents, the disputed requests seek: every version of the CBCP (RFP 3);[6] drafts and revisions of the CBCP (RFP 4); documents discussing the creation or modification of the CBCP, including "assessments, audits, data, examinations, investigations, literature, reports, reviews, studies , [and] surveys" (RFP 5); guidance, advice, or legal opinions relied upon in creation or modifying the CBCP (RFP 6); studies or assessments related to the validation of the CBCP (RFP 7); and documents related to any government investigation of the CBCP (RFP 28).

---

[5] Further references in this Opinion to any interrogatory or request for production will use the abbreviations "Rog" and "RFP."

[6] The Court notes the RFP seeks every version of "*every* Walmart policy for evaluating criminal history information." Throughout the discovery dispute letters, the parties reference both a "Base" CBCP and a "Non-base" CBCP, with the former consisting of certain basic adjudication criteria applied in the background check for most positions and the latter consisting of certain heightened criteria for select positions. There is no dispute that Plaintiffs applied for jobs subject to the base adjudication criteria. However, there is disagreement over whether the Base and Non-base categories constitute separate policies or whether they pertain to different levels of scrutiny within the same overall background check policy.

The Court will address them individually below, following its analysis of the relevance and proportionality issues presented.[7]

### III.   LEGAL STANDARDS

To resolve the CBCP discovery dispute, the Court begins with Federal Rule of Civil Procedure 26(b), which generally governs the scope of discovery in civil actions. The Rule provides

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

The Third Circuit has observed that it is "well recognized that the federal rules allow broad and liberal discovery." *Pacini v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999). In this regard, and as Rule 26 makes clear, the relevance standard to be applied at the discovery phase is more lenient than the standard at trial. *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000). "Courts have construed [Rule 26] liberally, creating a broad range for discovery which would encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issues that is or may be in the case." *Stepanski v. Sun Microsystems, Inc.*, No.10-2700, 2011 WL 8990579, at *18 (D.N.J. Dec. 9, 2011), *report and recommendation adopted*, 2012 WL 3945911 (D.N.J. Sept. 10, 2012).

---

[7] As of the August 5 letter, the CBCP discovery dispute had been somewhat narrowed by agreement of the parties. At page 2, the letter identifies certain discovery requests as to which Walmart has agreed to produce a subset of responsive information. To the extent this Opinion broadens the scope of responsive documents, the production must be supplemented accordingly.

However, the scope of discovery is not unlimited. *Robbins v. Camden City Board of Educ.*, 105 F.R.D. 49, 55 (D.N.J. 1985). The party seeking discovery must demonstrate that the information sought is relevant to the claims and issues in the case, as required by Rule 26. *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). Once this showing is made, the opposing party must show why discovery should not be permitted. *Cordero v. Warren*, No. 12-2136, 2016 WL 8199305, at *2 (D.N.J. Oct. 4, 2016), *aff'd*, 2017 WL 2367049 (D.N.J. May 31, 2017). Additionally, the Court maintains broad discretion to resolve issues pertaining to the scope of discovery under Rule 26. *See Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987). It may limit or deny discovery as to appropriate subjects of inquiry when the information sought is not proportional to the needs of the case, in light of certain considerations such as burden on the party providing discovery, whether the information sought is cumulative or redundant, and expense. *Schick v. Cintas Corp.*, Civ. No. 17-7441, 2020 WL 1873004, at *3 (D.N.J. Apr. 15, 2020); *Bowers v. National Collegiate Athletic Assoc.*, Civ. No. 97-2600, 2008 WL 1757929, at *4 (D.N.J. Feb. 27, 2008).

The Rule 26 questions of relevance and proportionality, in turn, must be informed by the claims and issues presented in the action in which discovery is sought. Here, Plaintiffs claim Walmart's CBCP had a racially discriminatory disparate impact on Black and Latino applicants for employment, in violation of Title VII. Thus, the contours of that claim, together with the allegations of the Complaint, frame this discovery dispute.

Title VII serves the "important purpose" of ensuring "that the workplace be an environment free of discrimination, where race is not a barrier to opportunity." *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). It aims "to promote hiring on the basis of job qualifications, rather than on the basis of race or color." *Griggs v. Duke Power Co.*, 401 U.S.

424, 434 (1971). In that regard, the statute makes it unlawful for an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2). Title VII "prohibits both intentional discrimination (known as "disparate treatment") as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as "disparate impact")." *Ricci*, 557 U.S. at 577.

A Title VII disparate impact claim focuses on rooting out employment practices that unintentionally operate to exclude protected groups. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011). The claim is established if "a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The Supreme Court has held that the touchstone of whether a challenged practice is unlawful is "business necessity." *Griggs*, 401 U.S. at 431. In other words, "[i]f an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 476 (quoting *Griggs*, 401 U.S. at 431).

In light of these elements, a disparate impact case proceeds in three steps. *Id*. First, the "plaintiff must establish a prima facie case by demonstrating that application of a facially neutral standard has caused a significantly discriminatory hiring pattern." *Id.* (quotations omitted). Next, the employer may defend against the prima facie demonstration of disparate impact by showing that the practice is job-related and consistent with business necessity, i.e., that the criteria applied

in the challenged practice are those that "define the minimum qualifications necessary to perform the job." *Id.* at 477. In the context of a case involving criminal background check procedures, the Third Circuit held that this "successful performance" benchmark of the business necessity defense means "that the policy under review accurately distinguish[es] between applicants that pose an unacceptable level of risk and those that do not." *El v. Se. Penn. Transp. Auth. (SEPTA)*, 479 F.3d 232, 245 (3d Cir. 2007). At this step, the employer must present compelling evidence of actual business necessity and bears both the burden of production and persuasion to demonstrate that the challenged practice is important to the position. *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 477; *see also El*, 479 F.3d at 240 (observing that Supreme Court decisions in which the business necessity defense was developed require "some level of empirical proof that challenged hiring criteria accurately predict job performance."). At the last step, if the employer defendant has satisfied the business necessity standard, the plaintiff may nevertheless prevail on his or her Title VII claim by coming forward with evidence of a less discriminatory alternative practice, i.e., a practice that serves the legitimate, job-related goals of the challenged practice but results in less of a disparate impact. *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 477; *see also El*, 479 F.3d at 240 n.9 ("the successful assertion of the business necessity defense is not an ironclad shield; rather, the plaintiff can overcome it by showing that an alternative policy exists that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect.").

## IV.  ANALYSIS

This dispute presents two related and overlapping issues: the relevance of materials related to the development of the CBCP used by Walmart to screen Plaintiffs and deny them employment and the time period applicable to such discovery. The Court addresses each in turn.

As to substantive scope, the primary disagreement appears to be whether Plaintiffs are entitled to documents and materials underlying and surrounding the creation of the CBCP and any subsequent modification to the policy, including memoranda discussing its formulation or revision, drafts of the policy, documents relied on in creating/revising, and any validation studies performed in connection with reviewing the CBCP and the adjudication criteria used in the screening process. Relatedly, the parties disagree as to whether Walmart must identify all individuals who were involved in creating and modifying the CBCP and adjudication criteria. Walmart argues that none of the information at issue in this dispute is relevant to this action's core liability issues, whereas Plaintiffs contend the discovery is essential to their ability to rebut the business necessity defense on a Title VII disparate impact claim, as it pertains both to refuting the job-relatedness of the CBCP and applicable screening criteria and exploring whether Walmart considered less discriminatory but effective alternatives. In short, the disputed discovery seeks information concerning how and why the CBCP was created, reviewed, and modified.

The Supreme Court's decision in *Ricci v. DeStefano* illustrates the issues and information relevant to a Title VII disparate impact analysis. *See* 557 U.S. 557 (2009). *Ricci* addressed the somewhat unique question of when an employer's racially-conscious, discriminatory action may be justified to avoid or remedy an unintentional disparate impact. *Id.* at 585. The claim in *Ricci* arose out of the decision by a municipal employer, the City of New Haven, Connecticut, to discard the results of an examination administered to firefighters seeking promotion, an action it took on the grounds that had the results been certified, the City and other municipal defendants might have been exposed to a Title VII disparate impact claim in light of the racial disparities resulting from the exam. *Id.* at 562. Various firefighters who passed the examination but were

denied promotion brought a Title VII disparate treatment claim based on the city's refusal to certify the results. *Id*.

Although the analysis performed in *Ricci* to reconcile the disparate treatment and disparate impact provisions of Title VII is only indirectly applicable to the discovery in this case, the Supreme Court's extensive review of the record in *Ricci* bears on this Court's evaluation of the relevance of the material sought by Plaintiffs in this matter. The *Ricci* Court recounted in great detail the evidence relating to the city's efforts to develop and implement examinations that would not run afoul of Title VII's disparate impact prohibition. *Id.* at 565-575. This evidence included testimony from city officials and the third-party hired to formulate the test for firefighter promotions as to the "detailed steps [the third party] took to develop and administer the examinations," the analyses conducted to ensure the test was job-related, and the source material from which the test questions were formulated. *Id.* at 588. It also included evidence concerning the exam's validity and the availability of validation studies conducted by the third party. *Id.* at 589. The Supreme Court highlighted and relied on these items in support of its finding that there was "no genuine dispute that the examinations were job-related and consistent with business necessity." *Id.* at 688.

The Third Circuit's decision in *El v. SEPTA* is also instructive, as it considered the business necessity defense in the context of a summary judgment motion in a Title VII action challenging a criminal background check policy. *El*, 479 F.3d at 245-246. In *El*, the plaintiff, who was hired for and later terminated from the position of paratransit driver, claimed the defendant transit authority's policy of screening applicants for that position and disqualifying those who had been convicted of a violent crime had an unlawful disparate impact on African Americans and Hispanics, whom plaintiff argued were "more likely to have a criminal record"

and therefore "more likely to run afoul of the policy." *Id.* 236-37. The Third Circuit affirmed summary judgment in favor of the defendant employer, based on its unrebutted evidence that the policy was consistent with business necessity. *Id.* 245-47. The Court reasoned that while the defendant had established the business necessity defense by proffering expert testimony indicating the policy was job-related and justified in light of recidivism concerns and the vulnerable population served by paratransit drivers, the plaintiff had not come forward with evidence to refute the transit authority's demonstration. *Id.* at 247. The Third Circuit's ensuing discussion of the shortcomings of the plaintiff's case illustrates the kind of evidence a Title VII plaintiff might present to rebut a business necessity defense. It observed that, in addition to hiring his own expert and deposing the defendants' experts, the plaintiff may explore the transit authority's lack of care and precision in crafting its policy to meet its job-related and legitimate goals. *Id.* at 247-48. Indeed, as relevant to the business necessity defense, the Court observed the record contained relevant, albeit insufficient, evidence pertaining to the process and aims of the challenged policy, noting that various transit employees had been identified by the defendant as having knowledge pertaining to business necessity yet none were "able to explain—beyond a general concern for passenger safety—why this particular policy was chosen from among myriad possibilities." *Id.* at 247-28. *El* makes clear that, while care in formulating hiring policies is not, strictly speaking, the standard for rebutting a prima facie disparate impact demonstration, the formulation of the policy and an employer's ability to show its policy is consistent with business necessity "will typically go hand-in-hand." *Id.* at 248.

Guided by the Supreme Court's *Ricci* opinion and the Third Circuit's decision in *El v. SEPTA*, this Court concludes that the discovery sought by Plaintiffs related to creation, implementation, and revision of Walmart's CBCP, including the adjudication criteria it utilized,

is relevant to their Title VII claim. Plaintiffs have persuasively argued that, though they may pre-date the Class Period, any documents and information concerning the initial formulation of the CBCP and the adjudication criteria used by Walmart to screen Plaintiffs and the putative Class, as well as subsequent revisions to the procedures and criteria, relate directly to Walmart's demonstration of business necessity, that is, to its burden of showing that the CBCP was tailored to the requirements of the job in question and intended to accurately identify applicants whose criminal histories presented an unacceptable level of risk. As such, Plaintiffs are entitled to discovery on this topic so that they may evaluate any business necessity defense Walmart presents and adequately prepare a rebuttal on a motion for summary judgment and/or at trial.

As to the temporal scope of discovery, broadly stated, Plaintiff contends the entire period beginning with discussions about formulating the CBCP, believed to have commenced as early as 2002, through the Class Period falls within the parameters of Rule 26. Walmart maintains that only the Class Period, with a brief lookback, is relevant, but in the spirit of compromise, offers to run a search applicable to the CBCP rollout period consistent with its Proposed Production. Walmart also argues that, even assuming the relevance of any information prior to the Class Period, the sweeping nature of Plaintiffs' request for almost twenty years' worth of information is unduly burdensome.

In support of their position, Plaintiffs rely primarily on the discovery decision issued in *Lee v. Hertz Corporation*, in connection with a Title VII disparate impact claim brought by minority employment applicants who alleged they were denied employment "based in whole or in part on Hertz's policy and practice of denying employment to individuals with criminal histories." *Lee v. Hertz Corp.*, Case No. 18-7481, 2019 WL 6219742, at *1 (N.D. Cal. Nov. 19, 2019). *Lee* addressed the discoverability of similar materials to those at issue here, requests

13

opposed by the defendant on grounds that they were targeted to a timeframe before the applicable class and limitations period, irrelevant, and burdensome. *Id.* Noting it was undisputed that the background check policy at issue was implemented prior to the class period, the court concluded that information regarding the creation of the policy and any changes thereto was relevant to the claim, as it would shed light on the reason for the policy. *Id.* Thus, the court ordered the defendants to produce all non-privileged responsive material, including drafts, from one year prior to the creation of the applicable policy to the present. *Id.* at *2.

The concern animating the *Lee* decision is clear. A snapshot of the policy and related information as they existed during the limitations period applicable to a Title VII disparate impact claim would be unlikely to provide any understanding at all as to the employer's allegedly legitimate and job-related aims in creating the policy or as to whether other feasible but less discriminatory alternatives were available. Consequently, the order directing the defendant employer in *Lee* to produce documents and information for essentially the lifespan of the policy was calculated to yield discovery capturing the evolution of the challenged policy and, in that way, assist the plaintiffs in evaluating whether the defendant could establish it was consistent with business necessity.

Here, that same concern applies. For this reason, Walmart's Proposed Production, limited to two distinct time periods, would provide a static and thus insufficient view of the CBCP. The Court acknowledges that, as of the latest compromise effort between the parties, Walmart had expanded upon the Proposed Production, offering to produce all final versions of the CBCP and adjudication criteria guidelines from implementation through the Class Period, as well as drafts and revisions of every version of the CBCP during the Class Period. This supplement is significant, as it partially captures the development and evolution of the CBCP between its initial

introduction and the period in which the policy affected Plaintiffs. However, it fails to capture drafts and revisions of the CBCP during the interim period and wholly avoids production of any internal reviews, assessments, or studies of the CBCP undertaken during the life of the policy.

At the same time, the Court is also mindful that Rule 26 sets two measures for permissible discovery: relevance and proportionality. The latter must take into consideration, among other factors, the needs of the case and the burden of providing the discovery. On the one hand, the needs here are compelling, as Plaintiffs have brought a nationwide class action alleging serious, pervasive, and wide-ranging race-based discrimination by a prominent retail corporation that employs nearly 1.6 million people in the United States alone.[8] On the other hand, the Court acknowledges that searching for responsive records for a period spanning nearly twenty years may be time-consuming, difficult, and expensive.

Nevertheless, the Court finds the proposal set forth by Plaintiffs in the October 24 letter to the Court to strike a reasonable balance between obtaining relevant information consistent with the needs of this case and avoiding undue burden on Walmart. Plaintiffs' proposal contains three parts:

First, Walmart's response to RFPs 3 through 6 will focus on two time periods: fiscal year ending ("FYE") 2003 to FYE 2006 and FYE 2012 to FYE 2016. Plaintiffs have identified these periods based on an internal Walmart document, produced in discovery, concerning criminal background screening of Walmart employees in the hiring process. The Court will not describe the document in any detail here, as it was produced with the highest confidentiality designation of "attorneys' eyes only." It suffices to state that the Court has reviewed the document *in camera* and is persuaded that its brief summary of the history of Walmart's background check program,

---

[8] *See* Walmart: About, https://corporate.walmart.com/about (last visited Dec. 16, 2022).

at the page bates stamped WM-RAMOS-0003109, strongly suggests that Walmart's files during these time periods are likely to contain relevant material concerning creation, implementation, and revision of the CBCP. Additionally, the Court finds the demonstration of the importance of these time periods sufficiently compelling to warrant the inclusion of electronically stored information ("ESI") in Walmart's search for responsive documents.

Second, Walmart's response to Rogs 4 through 7 will, for the same reason, focus on these two time periods with an apparent close nexus to the disparate impact claim, especially the business necessity defense. The Court here highlights an ongoing dispute as to Rog 5, which asks Walmart to identify the individuals involved in the creation or modification of the CBCP. Walmart's objection to responding to this interrogatory as overbroad and burdensome is noted, but the fact that many people may fall within the scope of the interrogatory does not relieve Walmart of identifying potential fact witnesses. The narrowed time frame should relieve some of the burden of responding and the scope of the response could be further narrowed through meet-and-confer to certain categories of individuals. For example, as to Walmart-employees, the response can be limited to team leaders, chairs or persons in charge of groups, committees, or task forces organized by Walmart in connection with the creation or modification of the CBCP. As to non-Walmart employees involved in the CBCP formulation or revision, the group may be limited to criminologists, risk management consultants, and other outside professionals retained by Walmart in the two time periods.

Third, Walmart's obligation to respond to RFP 7, which seeks validation studies, will correspond to the time period from the creation and implementation of the CBCP through the Class Period. The validation studies Walmart may have conducted go to the core of the Title VII burden of proof analysis pertaining to the challenged practice's job-relatedness. Validation refers

to the "process of determining whether a selection device is sufficiently job related to comply with the requirements of Title VII." *Blake v. City of Los Angeles*, 595 F.2d 1367, 1377 (9th Cir. 1979). Discussing the importance of validation studies in a disparate impact case, the Ninth Circuit noted that the burden of proving business necessity "is not a burden that can be carried by the assertion of an 'obvious,' but unmeasured, relationship between selection standards and qualities thought necessary for job performance . . . Rather, it is essential that selection devices be 'validated' by professionally-acceptable methods." *Id.* at 1378 (citing *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977) and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975)). Any validation studies conducted by Walmart regarding the CBCP to measure the relationship between its adjudication criteria and the requirements of Walmart's jobs are highly relevant to the liability issues in this action. Thus, the relevance and need for the discovery requested in RFP 7 outweigh any burden Walmart may claim from searching its records, from the time the CBCP was created through the Class Period. Walmart must produce all such studies and, if none exist or are located after a reasonably diligent search, Walmart may respond to this discovery request by confirming as much, in accordance with Rule 26(g).

Fourth, as to RFP 28, the Court finds the request as drafted is overly broad. In its discretion, the Court narrows the request as follows: All documents relating to any investigation by any governmental agency (federal, state, or local) that directly addresses Walmart's criminal history policies, practices, and processes under applicable federal and state law or that directly addresses the conduct alleged in the Complaint.

Additionally, in view of the District Court's recent order concluding a six-year statute of limitations period applies to the CHRIA claim,[9] production in response to Plaintiffs' discovery requests, including those at issue in this dispute, shall be accordingly supplemented.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Walmart shall produce discovery responses consistent with the parameters set forth above. The production shall begin no later than April 3, 2023, and continue thereafter on a rolling basis, to be completed by June 5, 2023.

**SO ORDERED** this 2nd day of March 2023.

 /s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge

---

[9] *See* Opinion and Order, dated January 12, 2023 [ECF 128 and 129].